UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CHRISTINE A. LARSON,

                            Plaintiff,                           DECISION & ORDER

                v.                                               19-CV-0116MWP

COMMISSIONER OF SOCIAL SECURITY,

                            Defendant.
_____


## PRELIMINARY STATEMENT

        Plaintiff Christine A. Larson ("Larson") brings this action pursuant to Section

205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision

of the Commissioner of Social Security (the "Commissioner") denying her application for

Supplemental Security Income ("SSI").  Pursuant to the Standing Order of the United States

District Court for the Western District of New York regarding Social Security cases dated June

1, 2018, this case has been reassigned to, and the parties have consented to the disposition of this

case by, the undersigned.  (Docket # 13).

        Currently before the Court are the parties' motions for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket ## 10, 11).  For the

reasons set forth below, this Court finds that the decision of the Commissioner is supported by

substantial evidence in the record and is in accordance with applicable legal standards.

Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Larson's

motion for judgment on the pleadings is denied.

**DISCUSSION**

I.   **Standard of Review**

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be

2

sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). In assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

(1) whether the claimant is currently engaged in substantial gainful activity;

(2) if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3) if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations (the "Listings");

(4) if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity [("RFC")] to perform [her] past work; and

(5) if not, whether the claimant retains the [RFC] to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467. "The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

3

step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).


II.    **The ALJ's Decision**

In her decision, the ALJ followed the required five-step analysis for evaluating disability claims.  Under step one of the process, the ALJ found that Larson had not engaged in substantial gainful activity since March 19, 2015, the application date.  (Tr. 17).[1]  At step two, the ALJ concluded that Larson had the severe impairments of "diabetes mellitus, arthropathic psoriasis, morbid obesity, bipolar disorder, depressive disorder and anxiety disorder." (*Id.*).  The ALJ also found that Larson had been diagnosed with hypertension, but that it was nonsevere. (*Id.*).  At step three, the ALJ determined that Larson did not have an impairment (or combination of impairments) that met or medically equaled one of the listed impairments in the Listings. (Tr. 17-18).

The ALJ concluded that Larson retained the RFC to perform light work but with certain limitations.  (Tr. 19-20).  Specifically, the ALJ found that Larson "must alternate between sitting and standing once every hour for five minutes, without increasing time off task"; "could perform occasional pushing and pulling, occasional climbing of ramps and stairs, occasional balancing on level surfaces, and occasional stooping (i.e., bending at the waist), kneeling, crouching (i.e., bending at the knees), but never crawling"; "could perform frequent but not constant bilateral handling (including gross manipulation), fingering (including fine manipulation) and feeling"; "could never tolerate exposure to unprotected heights, moving

---

[1]  The administrative transcript (Docket # 7) shall be referred to as "Tr. ___," and references thereto utilize the internal Bates-stamped pagination assigned by the parties.

machinery and moving mechanical parts"; was "able to understand, carry out and remember simple, routine and repetitive tasks, defined as work that requires doing the same tasks every day with little variation in location, hours or tasks"; was "limited to working in a low stress environment (meaning one with no supervisory responsibilities; no work at production rate pace and no fast-paced assembly-line work; no independent decision-making required except with respect to simple, routine, repetitive decisions; and with few, if any, workplace changes in workplace routines, processes or settings)"; was "limited to work that would not require a high level of attention to detail"; was limited to work where "[v]erbal instructions [were] the preferred method to receive instructions"; was "limited to work that does not require travel to unfamiliar places and to work that involves occasional contact and interaction with supervisors and coworkers, with only incidental contact with the public"; and was "limited to work that could be performed independently or work that could be performed generally isolated from other employees, although coworkers could be in the general work area."  (Tr. 19-20).

   At steps four and five, the ALJ found that Larson had no past relevant work but, based on Larson's age, education, work experience, and RFC, that other jobs existed in significant numbers in the national economy that Larson could perform, such as housekeeping/cleaner, marker, and garment sorter.  (Tr. 27-28).  Accordingly, the ALJ found that Larson was not disabled.  (Tr. 28-29).

## III. <u>Larson's Contentions</u>

   Larson contends that the ALJ's determination that she is not disabled is not supported by substantial evidence and is the product of legal error.  (Docket ## 10, 12).  First, Larson argues that the ALJ erroneously failed to evaluate or consider her diagnosed schizoid

personality disorder at step two.  (Docket ## 10-1 at 13-18; 12 at 1-2).  Second, Larson maintains

that the ALJ erred at step three by failing to properly evaluate her psoriasis under Listing 8.05.

(Docket ## 10-1 at 18-22; 12 at 2-4).  And third, Larson contends that the ALJ's "hyper specific"

RFC determination is flawed because the ALJ reached that determination without a supportive

medical opinion, after she "gave only 'some weight' to all medical opinions of record, essentially

rejecting them all."  (Docket ## 10-1 at 22-26; 12 at 4-6).

## IV.   Analysis

### A.   The ALJ's Step Two Determination

I turn first to Larson's step two argument.  Larson maintains that "at no point did

the ALJ discuss [her diagnosis of] schizoid personality disorder and its attendant symptoms."

(Docket # 10-1 at 13).  In Larson's view, this omission "invalidates [the ALJ's] RFC finding,

[and] it also undermines [the ALJ's] rejection of LMHC [Kristen] Shaffer's expert opinion that

was based on schizoid personality disorder."  (*Id.*).  The Commissioner responds that any error in

failing to mention Larson's schizoid personality disorder at step two is harmless because the ALJ

found several of Larson's other mental impairments to be severe at step two and, when making

the RFC determination, the ALJ "considered all medical opinions of record on [Larson's] mental

functioning."  (Docket # 11-1 at 12-13).  In the Commissioner's view, "it is the functional

limitations, not the alleged conditions, which are at issue in the disability determination."  (*Id.* at

13).  Upon review, I find that remand is not warranted based on the ALJ's step two

determination.

At step two of the evaluation, the ALJ must determine whether the claimant has a

"severe impairment" that "significantly limits [the claimant's] physical or mental ability to do

basic work activities." 20 C.F.R. §§ 416.920(a)(4)(ii), (c). "An impairment or combination of

impairments is 'not severe' when medical and other evidence establishes only a slight

abnormality or a combination of slight abnormalities that would have at most a minimal effect on

an individual's ability to perform basic work activities." *Jeffords v. Astrue*, 2012 WL 3860800,

*3 (W.D.N.Y. 2012) (quoting *Ahern v. Astrue*, 2011 WL 1113534, *8 (E.D.N.Y. 2011)); *see also*

*Schifano v. Astrue*, 2013 WL 2898058, *3 (W.D.N.Y. 2013) ("[a]n impairment is severe if it

causes more than a *de minimus* limitation to a claimant's physical or mental ability to do basic

work activities"). "[T]he mere presence of a disease or impairment, or establishing that a person

has been diagnosed or treated for a disease or impairment is not, by itself, sufficient to render a

condition severe." *Taylor v. Astrue*, 32 F. Supp. 3d 253, 265 (N.D.N.Y. 2012) (quotations

omitted). Moreover, as a general matter, any error in an "ALJ's severity assessment with regard

to a given impairment is harmless . . . 'when it is clear that the ALJ considered the claimant's

[impairments] and their effect on his or her ability to work during the balance of the sequential

evaluation process.'" *Graves v. Astrue*, 2012 WL 4754740, *9 (W.D.N.Y. 2012) (alteration in

original) (quoting *Zenzel v. Astrue*, 993 F. Supp. 2d 146, 153 (N.D.N.Y. 2012)).

   I agree with Larson that the record demonstrates that she was diagnosed with

schizoid personality disorder by several medical sources (*see, e.g.*, Tr. 604-13 (initial psychiatric

assessment conducted at Olean Counseling Center on December 7, 2012, diagnosing and noting

Larson's history with schizoid personality disorder); Tr. 417-22 (November 5, 2013 treatment

note from psychiatrist Dr. Syed Ali Raza Shamsi ("Shamsi"), MD, noting Larson's reported

history with schizoid personality disorder); Tr. 501-06 (January 31, 2017 mental medical source

statement from Kristen Shaffer ("Shaffer"), LMHC, noting schizoid personality disorder as one

of Larson's diagnoses)) and that the ALJ should have considered all of Larson's diagnosed

mental impairments, including her schizoid personality disorder, in conducting her step two severity analysis. Nevertheless, I find that the ALJ's failure to explicitly do so in this case was harmless. *See Schifano v. Astrue*, 2013 WL 2898058 at *3 ("[w]here a finding of a severe impairment is improperly omitted, the error may be deemed harmless where the disability analysis continues and the ALJ considers the omitted impairment in the RFC determination") (citing *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (summary order)).

As an initial matter, although the ALJ did not discuss schizoid personality disorder at step two, Larson's suggestion that the ALJ did not mention or account for that diagnosis at all in her decision is inaccurate. Specifically, in recounting the testimony given during the administrative hearing, the ALJ recognized that Larson's representative proffered schizoid personality disorder as a severe impairment (Tr. 20 (referencing Tr. 42)), demonstrating that the ALJ was aware of the impairment. Moreover, the ALJ considered Shaffer's mental medical source statement, which listed schizoid personality disorder as one of the diagnoses affecting Larson's mental functional capacity, and, as discussed in more detail below (*see infra* Section IV(C)), the ALJ actually accommodated many of the limitations contained in Shaffer's opinion in the mental portion of the RFC determination. (Tr. 26, 501, 773).[2]

In addition, I disagree with Larson's claim that the ALJ erred by failing to analyze Larson's apparent inability to remain compliant with treatment in the context of her schizoid personality disorder. (Docket # 10-1 at 14-16). Larson contends that this error was harmful because the ALJ used Larson's noncompliance against her throughout the disability determination, which Larson posits is evident based on a review of the ALJ's decision. (*See*,

_____

[2] Larson states that Shaffer's opinion "was based on schizoid personality disorder." (Docket # 10-1 at 13). Although it is true that Shaffer considered that diagnosis, Shaffer's opinion was not based solely on schizoid personality disorder. Indeed, Shaffer explicitly stated that her opined limitations were "due to [Larson's] co-morbid diagnosis," which also included bipolar disorder and binge-eating disorder. (Tr. 503, 773, 881).

*e.g.*, Tr. 21 ("[Larson] acknowledged that she has been noncompliant with treating her mental health and she stated that when she is on medication, she feels she could deal with things better"); Tr. 22 (citing records that indicate Larson "is an extremely noncompliant patient"); Tr. 23 ("[t]he medical record regarding [Larson's] mental impairments similarly shows lack of compliance, with improvement when [Larson] does maintain treatment"); Tr. 24 ("[t]he medical record therefore shows that [Larson] is extremely noncompliant with taking her medication and with performing bloodwork as instructed")).

In Larson's view, her medication and treatment compliance issues were directly related to her diagnosed schizoid personality disorder because that impairment apparently "predisposes an individual to non-compliance and diminishes the possibility of improving with treatment." (Docket # 12 at 2). Larson cites to medical records noting that she had a "significant personality component to her illness," which affected her insight into her mental illness and led her to have "difficulty acknowledging [the] presence of psychiatric problems." (Docket # 10-1 at 16 (citing Tr. 412, 677, 772)). According to Larson, because "noncompliance with treatment and the inability to improve with medications are hallmarks of schizoid personality disorder[,] . . . the ALJ's use of these as factors *against* [Larson] was improper." (*Id.* at 16 (emphasis in original)).

While Larson's submissions identify apparent differences between the conditions of schizoid personality disorder and her other diagnosed mental impairments (*see id.* at 15-16), Larson does not identify any medical evidence in the record linking her well-documented noncompliance issues specifically to her schizoid personality disorder diagnosis. Indeed, all the medical records cited by Larson in support of her contention also specify that she suffered from bipolar disorder, which the ALJ found to be a severe impairment at step two, and those records

do not attribute her noncompliance issues to schizoid personality disorder.  (*See* Tr. 17, 412, 421, 430, 678, 772, 881).

In fact, at the administrative hearing, Larson's representative raised noncompliance issues in the context of Larson's bipolar disorder – not schizoid personality disorder.  (*See* Tr. 42 ("certainly with the bipolar as the record has shown there has been some noncompliance issues some that [Larson will] explain are out of her control but others are because of the nature of the impairment themselves")).  In her decision, the ALJ acknowledged that "there is some truth . . . on a general level" to the notion that Larson's noncompliance issues were "due to her bipolar disorder," but explained that Larson, when asked, did not attribute the problems to her mental illness; rather, Larson testified that her noncompliance owed to periods of homelessness and breakups with boyfriends, which affected her ability to find transportation to medical appointments.  (Tr. 24 (referencing Tr. 53, 64-65)).  On this record, Larson has not demonstrated that her schizoid personality disorder was the cause of her noncompliance issues in this case.

Larson's challenge to the ALJ's alleged improper "rejection" of Shaffer's opinion is unavailing for similar reasons.  (Docket # 10-1 at 17-18).  Shaffer completed a mental medical source statement on January 31, 2017.  (Tr. 501-506).  At that point, she had been treating Larson approximately twice a month since August 2016, consisting of individual therapy, psychiatric assessment, and medication management.  (Tr. 501).  Shaffer indicated that Larson carried diagnoses of schizoid personality disorder, bipolar disorder, and binge-eating disorder.  (Tr. 501, 773, 881).  Larson presented with moderate and fluctuating symptoms, and Shaffer opined that Larson's prognosis was poor to fair.  (Tr. 501).

Shaffer indicated that Larson's symptoms included anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with weight change; decreased energy; feelings of guilt or worthlessness; impairment in impulse control; mood disturbance; persistent disturbance of mood or affect; bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes; intense and unstable interpersonal relationships and impulsive and damaging behavior; emotional lability; deeply ingrained, maladaptive patterns of behavior; and involvement in activities that have a high probability of unrecognized painful consequences.  (Tr. 502).

Shaffer also opined that Larson's impairments and symptoms affected her ability to perform work-related activities on a day-to-day basis in a regular work setting.  (Tr. 503). Regarding the mental abilities and aptitudes needed to do unskilled work, Shaffer opined that Larson was "seriously limited"[3] in her ability to carry out very short and simple instructions; maintain attention for a two-hour segment; maintain regular attendance and be punctual within customary, usually strict tolerances; make simple work-related decisions; perform at a constant pace without an unreasonable number and length of rest periods; and deal with normal work stress.  (*Id.*).  In Shaffer's view, Larson was "unable to meet competitive standards"[4] in this context in the following activities: sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being unduly distracted; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and

---

[3] On the mental medical source statement completed by Shaffer, the phrase "seriously limited" was defined to mean that a "patient ha[d] noticeable difficulty (e.g., distracted from job activity) from 11 to 20 percent of the workday or work week."  (Tr. 503).

[4] "Unable to meet competitive standards" on the mental medical source statement was defined to mean that a "patient ha[d] noticeable difficulty (e.g., distracted from job activity) from 21 to 40 percent of the workday or work week."  (Tr. 503).

responding appropriately to changes in a routine work setting.  (*Id.*).  In addition, with respect to the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms, Shaffer indicated that Larson had "no useful ability to function."[5]  (*Id.*).

Regarding the mental ability and aptitude needed to do particular types of jobs, Shaffer opined that Larson would be "seriously limited" in her ability to interact appropriately with the general public; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; travel in unfamiliar places; and use public transportation.  (Tr. 504).  In Shaffer's view, Larson would "struggle to accurately perform the activities . . . due to her co-morbid diagnosis."  (Tr. 503).

Furthermore, Shaffer opined that stress tolerance would be an issue for Larson in a work setting.  (Tr. 505).  Specifically, according to Shaffer, Larson would find the following demands of work stressful: speed; precision; deadlines; working within a schedule; making decisions; completing tasks; working with other people; dealing with the public (strangers); dealing with supervisors; being criticized by supervisors; simply knowing that work is supervised; remaining at work for a full day; and, little latitude for decision-making.  (*Id.*).  Shaffer anticipated that Larson would be absent from work about three days per month.  (*Id.*).

The ALJ gave Shaffer's opinion "partial weight," noting that while she was not an acceptable medical source according to the regulations, her opinion was relevant concerning Larson's functional limitations.  (Tr. 26).  The ALJ further explained that Shaffer's opinion was "consistent with the record regarding [Larson's] mental disorders[;] [h]owever, not all of the

---

[5]  "No useful ability to function" on the mental medical source statement was defined as "an extreme limitation," meaning that a "patient c[ould not] perform this activity on a regular, reliable and sustained schedule in a regular work setting."  (Tr. 503).

medical source statement that flow[ed] from the diagnoses [was] consistent with other evidence in the file" and noted that "[a]lthough [Larson] does have significant limitations, most of which are attributable to her lack of treatment, she does not demonstrate a complete inability to sustain an ordinary routine or to work in coordination with others without distraction." (*Id.*).

Contrary to Larson's contention, the ALJ's explanation demonstrates that she neither completely rejected Shaffer's opinion, nor discounted the opinion solely based upon Larson's noncompliance issues; rather, the ALJ rejected some of the most restrictive aspects of the opinion because those portions were not consistent with the record. In addition, for the reasons discussed above, it was not improper for the ALJ to consider Larson's noncompliance issues in evaluating Shaffer's opinion, particularly because Larson has not demonstrated that these issues were caused by her schizoid personality disorder. Thus, there is no basis to conclude that the ALJ's failure to explicitly consider Larson's noncompliance issues in the context of her schizoid personality disorder caused the ALJ to improperly reject Shaffer's opinion.

The ALJ's decision, while it could have identified more clearly the symptoms associated with each of Larson's diagnosed mental impairments, summarized the medical evidence relating to Larson's mental impairments and the associated medical opinions of record, including Shaffer's opinion, which took into account Larson's diagnosed schizoid personality disorder. The decision reflects that the ALJ evaluated the limitations identified by Larson, irrespective of whether she associated those impairments with a particular diagnosis. Moreover, Larson has failed to identify any symptom or limitation supported by the medical record that was not considered by the ALJ, much less one that was solely associated with her schizoid personality disorder. Accordingly, I conclude that the ALJ's error at step two was harmless. *See*, *e.g.*, *Marthens v. Colvin*, 2016 WL 5369478, *9 (N.D.N.Y. 2016) (ALJ did not commit

reversible error where she found plaintiff's schizoid personality disorder to be nonsevere at step

two; "plaintiff did not set forth any additional symptoms alleged to have been distinctly caused

by Schizoid Personality Disorder . . . that were not considered by the ALJ within her review of

plaintiff's other mental impairments[;] . . . [u]ltimately, substantial evidence supports the ALJ's

determination that plaintiff's schizoid personality disorder . . . w[as] not [a] severe

impairment[][;] [i]n making her RFC determination, the ALJ . . . considered [plaintiff's]

psychological symptoms from all alleged mental health issues, and weighed the medical opinion

evidence before her[;] [a]s the mental disability analysis continued beyond step two, and the ALJ

considered claimant's severe and non-severe impairments in h[er] RFC determination, any error

at step two is, at most, harmless"); *Chandler v. Colvin*, 2014 WL 4809902, *16 (D.S.C. 2014)

(step two error was harmless; "[a]lthough the ALJ did not mention anxiety as a separate

impairment, [p]laintiff has failed to indicate any limitation cause[d] by the anxiety that was not

considered by the ALJ in addressing [p]laintiff's limitations caused by PTSD"); *Hadaway v.

Comm'r, Soc. Sec. Admin.*, 2013 WL 5423955, *2 (D. Md. 2013) (failure to evaluate PTSD at

step two was harmless; "[s]ignficantly, however, [plaintiff] does not cite to any functional

limitations inherent in either personality disorder or PTSD that the ALJ did not already consider

in connection with [plaintiff's] other severe mental impairment, bipolar disorder[;] . . . the ALJ's

RFC analysis correctly considered all of [plaintiff's] limitations, without attributing those

limitations to any particular diagnosis"); *Miller v. Astrue*, 2012 WL 832557, *1 (N.D. Ohio

2012) (no reversible error committed where ALJ "failed to find that [claimant] suffered from a

'cognitive and/or schizoid personality disorder' at step two[;] [the ALJ] did conclude that

[claimant] suffered from severe mental impairments[;] [t]hereafter, the ALJ recognized and

considered [claimant's] work-related limitations in analyzing [the] RFC[;] . . . the ALJ included

14

cognitive impairments in his RFC, including limitations regarding [claimant's] ability to perform complex tasks, work involving arbitration, confrontation, or negotiation, and stress-related and production quota limitations[;] [t]he ALJ also identified social limitations[;] [t]hus, while the ALJ may not have concluded that [claimant] suffers from a severe impairment at step two, the [c]ourt agrees that any alleged error would be harmless as the ALJ considered limitations relating to this impairment in addressing [claimant's] RFC"), *aff'd*, 524 F. App'x 191 (6th Cir. 2013).

        Accordingly, I do not find that remand is warranted on this basis.

**B.**    <u>**The ALJ's Step Three Determination**</u>

        I turn next to Larson's step three argument that the ALJ erroneously evaluated whether Larson qualified as disabled under Listing 8.05 of 20 C.F.R. Part 404, Subpart P, Appendix 1, a listed impairment addressing "dermatitis." (Docket # 10-1 at 18-22). At step three, the ALJ stated that Larson's "arthropathic psoriasis d[id] not meet the requirements of any listing under 8.00, *skin disorders*, especially 8.05, *dermatitis*." (Tr. 18). Larson argues that this one-sentence explanation was "wholly insufficient," and she points to record evidence purportedly demonstrating that she meets each requirement of that listing. (Docket # 10-1 at 20-21). The Commissioner disagrees that the record supports a finding that Larson meets this listing, asserting that "there is no evidence that [Larson's] skin lesions resulted in serious limitations." (Docket # 11-1 at 14). I agree with the Commissioner and find that remand is not warranted on this basis.

        "At step [three] of the sequential evaluation process for determining disability in adult . . . claims, [the Commissioner] make[s] a medical assessment to determine whether an individual's impairment(s) meets a listing in [20 C.F.R. Part 404, Subpart P, Appendix 1]." Social Security Ruling ("SSR") 17-2P, 2017 WL 3928306, *2 (Mar. 27, 2017); *see also* 20

C.F.R. § 416.920(a)(4)(iii).  "[A] claimant is entitled to a conclusive presumption that [she] is disabled if [her] impairment meets or is medically equivalent to an impairment listed in [the Listings]."  *Carter v. Colvin*, 2016 WL 3360559, *11 (E.D.N.Y. 2016).  In order to meet a listed impairment, a claimant "must show that [her] impairment meets or equals *all* specified criteria of a listing[;] . . . '[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify.'"  *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 529-30 (1990)).  The claimant bears the burden to prove that his or her impairments meet or equal a listed impairment.  *See Naegele v. Barnhart*, 433 F. Supp. 2d 319, 324 (W.D.N.Y. 2006).

   "Where the claimant's symptoms, as described in the medical evidence, appear to match those described in the Listings, the ALJ must provide an explanation as to why the claimant failed to meet or equal the Listings."  *Kuleszo v. Barnhart*, 232 F. Supp. 2d 44, 52 (W.D.N.Y. 2002).  If the ALJ fails to do so, however, "the court may 'look to other portions of the ALJ's decision and to clearly credible evidence in finding that h[er] determination was supported by substantial evidence.'"  *Hall v. Berryhill*, 2018 WL 1071508, *3 (W.D.N.Y. 2018) (quoting *Berry*, 675 F.2d at 469); *accord* SSR 17-2P, 2017 WL 3928306 at *4 (an ALJ is "not required to articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment[;] [g]enerally, a statement that the individual's impairment(s) does not medically equal a listed impairment constitutes sufficient articulation for this finding").

   Listing 8.05 concerns skin disorders, specifically "dermatitis (for example, psoriasis[]), with extensive skin lesions that persist for at least 3 months despite continuing

treatment as prescribed." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 8.05.[6] "Extensive skin lesions"

are "those that involve multiple body sites or critical body areas, and result in a very serious

limitation." *Id.* at § 8.00(C)(1). Examples meeting the definition of "extensive skin lesions"

include: "(a) [s]kin lesions that interfere with the motion of [a claimant's] joints and that very

seriously limit [a claimant's] use of more than one extremity; that is, two upper extremities, two

lower extremities, or one upper and one lower extremity[;] (b) [s]kin lesions on the palms of both

hands that very seriously limit [a claimant's] ability to do fine and gross motor movements[;]

(c) [s]kin lesions on the soles of both feet, the perineum, or both inguinal areas that very

seriously limit [a claimant's] ability to ambulate." *Id.* at § 8.00(C)(1)(a)-(c). "[E]ven where a

claimant suffers from chronic psoriasis, the impairment does not meet the requirements of listing

8.05 where the record contains insufficient evidence of such severe functional limitations."

*Gonzalez v. Comm'r of Soc. Sec.*, 2016 WL 1306012, *5 (D.N.J. 2016).

   Larson cites record evidence documenting her "'extensive psoriatic lesions' on

both upper extremities, abdomen, and both lower extremities," which caused "significant pain

and discomfort affecting both upper extremities[, and] both knees and feet." (Docket # 10-1 at

20 (citing Tr. 508, 509, 514, 533, 535, 540, 541, 543, 550, 551, 553)). The ALJ recognized the

existence of these lesions in her RFC analysis. (Tr. 22).

   Even assuming that she can meet the durational requirement of Listing 8.05,

however, Larson points to no evidence documenting any "very serious limitation" caused by her

psoriatic lesions. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 8.00(C)(1); *accord Gonzalez v.*

*Comm'r of Soc. Sec.*, 2016 WL 1306012 at *5. Moreover, although the ALJ did not elaborate

---

[6] The Listings have been amended several times since the ALJ's May 8, 2018 decision. This decision cites to the Listings effective at the time of the ALJ's decision. *See Williams v. Berryhill*, 2018 WL 1663260, *3 n.3 (W.D.N.Y. 2018) (stating that the "relevant version" of the applicable listing was the version effective at the time of the ALJ's decision).

17

upon her consideration of Listing 8.05 at step three, other portions of her decision as well as credible record evidence support her determination that Larson did not meet the listing. *See Hall v. Berryhill*, 2018 WL 1071508 at *3.

Specifically, following her discussion of the evidence related to Larson's psoriasis, the ALJ discussed the June 24, 2015 internal medicine examination conducted by Dr. Samuel Balderman ("Balderman"), MD. (Tr. 22-23, 495-98). Balderman recognized that one of Larson's chief complaints was psoriasis, for which she had been taking medication for "almost 20 years with mixed results." (Tr. 495). With respect to activities of daily living, Larson reported being able to bathe and dress herself as needed. (Tr. 496).

On physical examination, Larson appeared to be in no acute distress, had normal gait, could walk on her heels and toes without difficulty, could squat 60% of full, had a normal stance, used no assistive devices, needed no help changing for the examination or getting on and off the table, and was able to rise from a chair without difficulty. (*Id.*). Balderman indicated that Larson had "diffuse psoriasis" with "[n]o significant adenopathy." (*Id.*). Larson's musculoskeletal examination also revealed normal results; her joints were stable and nontender, and there was no redness, heat, swelling, or effusion. (Tr. 497). Neurologically, she had no sensory deficits and had full strength in her upper and lower extremities. (*Id.*). Larson also had intact hand and finger dexterity, as well as full grip strength bilaterally. (*Id.*).

Balderman diagnosed Larson with obesity, psoriasis, hypertension, and diabetes, stated that she had a stable prognosis, and ultimately opined that Larson only had "[m]ild to moderate limitation[s] [in performing] sustained physical activities *due to poor weight control*." (*Id.* (emphasis supplied)). The ALJ assigned Balderman's opinion "partial weight," recognizing that the opinion was "consistent with the record as it relate[d] to the diagnoses of physical

impairments and with portions of the medical source statement that flow[ed] from the

diagnoses." (Tr. 26). In the ALJ's view, however, "the record overall support[ed] additional

limitations, including postural limitations and some gross and fine hand limitations, as contained

in the [RFC]." (*Id.*). Notably, Balderman did not opine that Larson's psoriatic lesions caused

any physical limitations.

     Moreover, aside from generally highlighting "significant pain and discomfort,"

Larson does not point to any evidence overlooked by the ALJ that would otherwise support a

finding that the lesions caused a "very serious limitation." Larson's step three argument

therefore fails because she has not demonstrated that she exhibited "extensive skin lesions," as

required for Listing 8.05. Accordingly, the ALJ's determination that Larson does not meet this

listing is supported by substantial evidence. *See*, *e.g.*, *Hurst v. Astrue*, 2015 WL 1475105, *3-5

(M.D. La. 2015) (ALJ's failure to cite and analyze Listing 8.05 at step three was harmless error

where plaintiff could not demonstrate she met the requirements of the listing; "[p]laintiff focused

on evidence which she argued showed that despite continuous treatment she had extensive skin

lesions that lasted for more than three months[;] . . . [e]ven if the evidence cited by the plaintiff

showed that she had the requisite skin lesions, the plaintiff failed to point to any evidence that the

lesions caused the type of serious limitations required by the regulations"); *Thornton v. Colvin*,

2014 WL 2515226, *4 (S.D. Ind. 2014) (remand not warranted based on the ALJ's failure to

address claimant's psoriasis at step three; "[e]ven if the ALJ should have addressed [claimant's]

psoriasis, the fact remains that a claimant has the burden of establishing that she meets or equals

all of the requirements of a given listing, . . . and here [claimant] has not pointed to any evidence

of record on which such a finding could be based[;] . . . [claimant] has pointed to nothing in the

record that suggests that her psoriasis had a 'very serious' effect on her ability to use her hands

or to ambulate, or that her psoriasis caused any other type of 'very serious limitation'"); *Claypool v. Astrue*, 2010 WL 2696736, *8-9 (N.D. Iowa 2010) ("[t]he ALJ's findings point to a lack of evidence in the record to support a finding that [claimant's] psoriasis causes a 'very serious limitation' as required by §§ 8.00C and 8.05[;] [i]n particular, neither [claimant's doctor], nor any other treating or non-treating physician finds that [claimant] has psoriasis which causes her 'very serious' limitations[;] [t]herefore, having reviewed the entire record, the [c]ourt finds that there is substantial evidence in the record which supports the ALJ's finding that [claimant's] psoriasis is not an impairment that meets the requirements of Listing § 8.05").

Remand is thus not warranted on this basis.

### C.   The ALJ's RFC Determination

I turn finally to Larson's argument that the ALJ erred in crafting her RFC determination.  (Docket # 10-1 at 22-26).  Larson asserts that the "RFC was unacceptable because the ALJ gave only 'some weight' to all medical opinions of record, and failed to tether the highly specific limitations to medical evidence, testimony, or the record *in any way*." (Docket # 12 at 4 (emphasis in original)).  I disagree.

An individual's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis."  *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)).  In making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis."  *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe

impairments, and [p]laintiff's subjective evidence of symptoms."  *Stanton v. Astrue*, 2009 WL
1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370 F. App'x 231 (2d
Cir. 2010) (summary order).

   Larson is correct that the ALJ did not assign controlling weight to any of the five
opinions assessing Larson's limitations in reaching the RFC determination.  (*See* Tr. 25-27).  As
discussed above, the ALJ assigned "partial weight" to Balderman's and Shaffer's opinions.
(Tr. 26).  The ALJ also gave "partial weight" to the June 24, 2015 psychiatric evaluation
completed by consultative psychologist Dr. Kristina Luna ("Luna"), PsyD.  (Tr. 25, 489-93).
Luna diagnosed Larson with the mental impairments of persistent depressive disorder, panic
disorder, and alcohol and cannabis abuse in full remission, and indicated that Larson had "good
adaptive functioning skills in all areas" and a good prognosis "given [Larson's] current level of
functioning."  (Tr. 492-93).  In Luna's opinion, Larson had "no limitations in her ability to
follow and understand simple directions and instructions, perform simple tasks independently,
maintain attention and concentration, maintain a regular schedule, make appropriate decisions,
[and] relate adequately with others," was "mildly limited in her ability to learn new tasks and
perform complex tasks independently," and was "moderately limited in her ability to
appropriately deal with stress."  (Tr. 492).  Luna noted that Larson's "[d]ifficulties [were] caused
by distractibility."  (*Id.*).

   In addition, the ALJ assigned "some weight" to the June 30, 2015 opinion of
non-examining state-agency psychologist H. Rozelman ("Rozelman"), PhD, who opined that
based on her affective and personality disorders, Larson had moderate difficulties in maintaining
social functioning and maintaining concentration, persistence or pace.  (Tr. 26, 86-87).
Rozelman also opined that Larson was capable of performing simple work, making simple

decisions, and responding to changes.  (Tr. 87).  Finally, the ALJ gave "partial weight" to the

August 25, 2017 assessment completed by Josephine Raab ("Raab"), ANP-C.  (Tr. 26, 547).

Raab diagnosed Larson with psoriatic arthritis, for which Larson took medication, and indicated

that Larson's prognosis was fair.  (Tr. 547).  Raab opined that Larson "maybe" could participate

in work activities and, if so, she did not have any restrictions or limitations.  (*Id.*).

        Apart from Larson's meritless challenge to the ALJ's assignment of weight to

Shaffer's opinion, discussed *supra* at Section IV(A), Larson does not otherwise contend that the

ALJ erred in evaluating any specific opinion in the record.  Rather, based solely on the fact that

the ALJ discounted the weight of each of these opinions, Larson maintains that the ALJ "did

[not] adequately explain the basis of [her RFC assessment] after essentially rejecting all of the

medical opinions."  (Docket # 10-1 at 26).  In Larson's view, because the ALJ gave "some

weight" to each of the medical opinions in the record, "[t]hat means the ALJ's finding that

[Larson] could perform a range of simple work was a 'best guess' based on [the ALJ's]

interpretation of the raw medical evidence."  (*Id.* at 24).

        Simply because the ALJ did not assign controlling weight to any opinion does not

mean that she "rejected" the medical opinion evidence in the record.  Indeed, an ALJ does not

necessarily "reject" opinion evidence by according it less than controlling weight and where, as

here, the ALJ's RFC determination incorporates limitations contained in that opinion.[7]  *See*, *e.g.*,

---

[7]  Irrespective of the terminology used by the ALJ, whether it be "great weight," "little weight," "some weight," or "no weight," the relevant inquiry is whether the ALJ in fact incorporates or accounts for the limitations assessed by the medical professional in the RFC, as opposed to basing the RFC upon his or her own lay interpretation of the medical evidence.  *Compare Freeman v. Comm'r of Soc. Sec.*, 2019 WL 2016585, *4 (W.D.N.Y. 2019) (RFC not supported by substantial evidence where ALJ gave "little weight" to the only medical opinion of record and failed to account for resting and lifting limitations assessed in the opinion); *Nanartowich v. Comm'r of Soc. Sec. Admin.*, 2018 WL 2227862, *9 (W.D.N.Y. 2018) (ALJ's discounting of only medical opinions of record created evidentiary gap in the record; "the ALJ explicitly accorded 'little weight' to the opinions [of the physicians], . . . and nothing suggests that the ALJ accounted for the limitations identified by these physicians in formulating the RFC"); *Wilson v. Colvin*, 2015 WL 1003933, *21 (W.D.N.Y. 2015) ("[a]fter discounting the opinions, the ALJ determined that [plaintiff] retained the physical RFC to perform the full range of light work[;] . . .

*Cottrell v. Comm'r of Soc. Sec.*, 2019 WL 201508, *3 (W.D.N.Y. 2019) ("[c]ontrary to [claimant's] assertion, the ALJ did not wholly reject [the doctors'] opinions; instead, she afforded them 'partial' and 'some' weight and . . . relied on portions of them to determine [claimant's] RFC[;] . . . [j]ust because the ALJ did not afford either opinion controlling weight does not mean that she substituted her own view of the medical evidence for those opinions"); *see also Harris v. Berryhill*, 2017 WL 4112022, *3 (W.D.N.Y. 2017) ("[p]laintiff contends that the ALJ improperly 'rejected' [doctors'] opinions [which the ALJ afforded 'less than significant weight'] without citing to another medical opinion[;] [p]laintiff overstates the ALJ's actions[;] [t]he ALJ did not 'reject' these opinions[;] [t]o the contrary, he gave them some weight and incorporated certain of the limitations set forth therein into his RFC finding"); *Bockeno v. Comm'r of Soc. Sec.*, 2015 WL 5512348, *5 (N.D.N.Y. 2015) ("the ALJ did not outright reject [doctor's] opinion, but afforded his opinion 'little weight'[;] [t]he ALJ's RFC determination includes non-exertional mental limitations, some of which are consistent with the limitations imposed by [doctor] and supported by other medical evidence in the record").

My review of the record reveals that the ALJ reached an RFC determination that is consistent with and incorporates many aspects of the opinion evidence. As far as Larson's physical limitations, the ALJ accepted Balderman's opinion that Larson had "mild to moderate limitation to [perform] sustained physical activities due to poor weight control," which is reflected by the ALJ limiting Larson to light work with a sit/stand option. *See, e.g., Jackson v.*

---

it is unclear how the ALJ arrived at this RFC or which impairments he considered in formulating his assessment"); *Gross v. Astrue*, 2014 WL 1806779, *18 (W.D.N.Y. 2014) (RFC not supported by substantial evidence where "[a]fter discounting [the physician's] opinion," the ALJ formulated the RFC "through her own interpretation of various MRIs and x-ray reports contained in the treatment records"); *with Burch v. Comm'r of Soc. Sec.*, 2019 WL 922912, *6 (W.D.N.Y. 2019) ("[a]lthough the ALJ accorded limited weight to both opinions, her RFC assessment nonetheless accounts for the majority of the limitations assessed by both doctors"); *Harrington v. Colvin*, 2015 WL 790756, *17 (W.D.N.Y. 2015) (same); *Crawford v. Astrue*, 2014 WL 4829544, *21 (W.D.N.Y. 2014) ("the ALJ's RFC assessment adopted the limitations assessed by [the physician] that were supported by the evidence and . . . his decision to afford [the physician] limited weight did not create a gap in the record").

*Berryhill*, 2018 WL 2235166, *3 (W.D.N.Y. 2018) ("[t]he [c]ourt finds the portion of the RFC that [p]laintiff refers to as a sit/stand option . . . appropriately [was] supported by [consultative examiner's] opinion that [p]laintiff has 'mild to moderate limitations for standing, walking, bending, and lifting, as well as mild limitations for sitting for a long time'"); *Nelson v. Colvin*, 2014 WL 1342964, *12 (E.D.N.Y. 2014) ("the ALJ's determination that [p]laintiff could perform 'light work' is supported by [consultative examiner's] assessment of 'mild to moderate limitation for sitting, standing, walking, bending, and lifting weight on a continued basis'").

Moreover, the ALJ assessed limitations in "addition[]" to those opined by Balderman, "including postural limitations and some gross and fine hand limitations." (Tr. 26). Contrary to Larson's argument that these limitations are not "tether[ed] . . . to medical evidence, testimony, or the record *in any way*" (Docket # 12 at 4), it is apparent that the ALJ based these additional limitations on Larson's own testimony. As the ALJ noted, Larson testified that her psoriatic arthritis caused swelling in her lower back, knees, and fingers, which affected her ability to stand, sit, bend her knees, make a fist with her hands, type, sew, and use the computer. (Tr. 21 (referencing Tr. 46-52)). In assessing the additional postural, handling, and fingering limitations, the ALJ seemingly gave Larson some benefit of the doubt regarding her complaints of pain and the restrictions Larson herself claimed were associated with her psoriatic arthritis. *See*, *e.g.*, *Haggins v. Comm'r of Soc. Sec.*, 2020 WL 4390698, *5 (W.D.N.Y. 2020) ("[i]t appears that the ALJ credited [p]laintiff's testimony and assessed more generous limitations in her physical RFC finding[;] . . . [t]he fact that the ALJ afforded [p]laintiff the benefit of the doubt and included additional limitations in her physical RFC finding is not grounds for remand"); *Burt v. Comm'r of Soc. Sec.*, 2020 WL 1467265, *5 (W.D.N.Y. 2020) ("[t]he ALJ was performing her

duty by using [the consultative examiner's opinion] and observations when formulating the RFC despite [the examiner's] opinion lacking explicit limitations on some exertional abilities").

In my view, the mental portion of the RFC determination is also supported by opinion evidence and adequately accounts for Larson's limitations.  For instance, the ALJ explicitly included stress-based limitations into the RFC, by limiting Larson to work in a "low stress environment," meaning work with "no supervisory responsibilities[,] no . . . production rate pace and no fast-paced assembly-line work[,] no independent decision-making required except with respect to simple, routine, repetitive decisions[,] and with few, if any, workplace changes in workplace routines, processes or settings."  (Tr. 19).  In addition, the ALJ limited Larson to "simple, routine and repetitive tasks," meaning "work that requires doing the same tasks every day with little variation in location, hours or tasks," and to work that would not "require a high level of attention to detail."  (*Id.*).  Moreover, the jobs identified by the ALJ at step five were all unskilled work with a specific vocational preparation ("SVP") level of two.  (Tr. 28).  These restrictions are reasonably based upon and incorporate limitations contained in Shaffer's and Luna's opinions.  (*See* Tr. 492 (Luna opined that Larson was "mildly limited in her ability to learn new tasks and perform complex tasks independently" and "moderately limited in her ability to appropriately deal with stress"); Tr. 503 (Shaffer opined that Larson was limited in her ability to "maintain attention for [a] two[-]hour segment," "sustain an ordinary routine without special supervision," "perform at a consistent pace without an unreasonable number and length of rest periods," "respond appropriately to changes in a routine work setting," and "deal with normal work stress")).

The ALJ also recognized and accounted for Larson's limitations regarding her ability to work with others.  Specifically, the ALJ limited Larson to "work that involves

25

occasional contact and interaction with supervisors and coworkers, with only incidental contact with the public" and to "work that could be performed independently or work that could be performed generally isolated from other employees, although coworkers could be in the general work area." (Tr. 19-20). These limitations align with many of Shaffer's opined restrictions, as well as with Luna's opinion that Larson's difficulties were caused by "distractibility." (*See* Tr. 492; *see also* Tr. 503-504 (Shaffer opined that Larson was limited in her ability to interact appropriately with the public, work in coordination with or in proximity to others without being unduly distracted, accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers without unduly distracting them)).

On this record, I find that the ALJ appropriately based her RFC determination on record evidence, including the several opinions in the record, and did not base the RFC upon her own lay interpretation of the medical evidence. I also find, for the reasons stated above, that the ALJ's RFC determination is otherwise supported by substantial evidence. *See Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order) ("[a]lthough the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole"); *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (the ALJ is "not require[d] . . . [to] mention[] every item of testimony presented to him or . . . explain[] why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability"). Thus, remand is not warranted on this basis.

## CONCLUSION

After a careful review of the entire record, this Court finds that the Commissioner's denial of SSI was based on substantial evidence and was not erroneous as a matter of law.  Accordingly, the ALJ's decision is affirmed.  For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 11)** is **GRANTED**.  Larson's motion for judgment on the pleadings **(Docket # 10)** is **DENIED**, and Larson's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
       August 25, 2020

27